IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MERLE LAMONT APPLEGATE, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3029 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

On February 15, 2012, the plaintiff, Merle L. Applegate, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.)[1] Applegate seeks a review of the Commissioner's decision to deny his application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. § 1383(c)(3). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 11-12.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 21.) I have carefully reviewed these materials, and I find

_____

[1] Carolyn W. Colvin has since been appointed to serve as Acting Commissioner of the Social Security Administration, (see Notice of Substitution, ECF No. 22), and as Astrue's successor, Colvin is "automatically substituted as a party," Fed. R. Civ. P. 25(d).

1

that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

On or about March 8, 2010, Applegate filed applications for SSI benefits (as noted above) and for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 150-160.  But see id. at 59 (indicating that Applegate's application for SSI benefits was filed on February 10, 2010).)  The SSI  application was denied on initial review, (id. at 59, 62-65), and on reconsideration, (id. at 60, 69-72).  Applegate then requested a hearing before an Administrative Law Judge (ALJ).  (Id. at 73-77.)  The hearing was held on August 3, 2011, (e.g., id. at 27), and, in a decision dated September 1, 2011, the ALJ concluded that Applegate "has not been under a disability, as defined in the Social Security Act, since February 10, 2010, the date the application was filed," (id. at 20-21 (citation omitted); see also id. at 10-21).  Applegate requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (See id. at 9.)  This request was denied, (see id. at 3-5), and after receiving and considering additional evidence, the Appeals Council declined to reopen the matter, (id. at 1-2).  Therefore, the ALJ's decision stands as the Commissioner's final decision on Applegate's application for SSI benefits.

All of the arguments presented in Applegate's brief are directed toward the Commissioner's decision on the SSI benefits application.  (See generally Pl.'s Br., ECF No. 15.)  The record does not indicate whether Applegate's application for disability insurance benefits was considered, much less decided "after a hearing to which he was a party."  42 U.S.C. § 405(g).  In other words, the transcript includes no "final decision" on Applegate's disability insurance benefits application.  To the

2

extent that Applegate's complaint seeks review of the Commissioner's decision on his application for disability insurance benefits, (see generally Compl., ECF No. 1), his complaint is dismissed for lack of jurisdiction, see 42 U.S.C. § 405(g) (providing for judicial review of "any final decision of the Commissioner of Social Security made after a hearing").

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Applegate indicated that his ability to work was limited by "[l]ower back problems with herniated disc" and "[o]steoarthritis." (Tr. at 200.) More specifically, he claimed that these impairments caused him "to make changes in [his] work activity" on October 2, 2001, and to stop working completely on September 15, 2008. (Id. at 200-201.) Applegate was born in January 1965, (id. at 59), and he reported that he completed the 12th grade in 1984, (id. at 201). However, Applegate's high school transcript indicates that he earned only 147.5 of the 150 hours required to graduate. (See id. at 246.) He has past work experience as a carpet cleaner, a laborer (performing house cleaning and yard work), and a caretaker of animals at a humane society. (Id. at 202. See also id. at 293.)

### A.   Medical Evidence[2]

On January 17, 2001, Applegate visited a clinic and reported that he had been experiencing low back pain since shoveling snow in early December. (Tr. at 339.) He was diagnosed with low back strain and sciatica, and he received a prescription for Vioxx. (Id.)

---

[2] My review of the medical evidence emphasizes the records discussed by the parties in their briefs. (See Pl.'s Br. at 4-5, ECF No. 15; Def.'s Br. at 2-7, ECF No. 21.)

Applegate's back pain did not improve, and on January 30, 2001, he received a prescription for a tapering dose of Prednisone.  (See id. at 338-39.)  On March 20, 2001, Applegate returned to the clinic and reported that the medications had done little to decrease the pain and numbness in his back and left leg.  (Id. at 338.)  The examiner noted, "The difficulty with this patient is that he has no insurance and we discussed needing further treatment to include possibly an MRI or CT but I think I would like one of the neurosurgeons to [determine] which would be best and if he truly needs to have those done at all."  (Id.)  A consultation "with Dr. Salumbides or Dr. Badejo" was to be arranged, and Applegate received samples of Celebrex to take in the interim.  (Id.)

On April 10, 2001, Dr. Ramon R. Salumbides obtained an MRI of Applegate's lumbar spine.  (Id. at 341, 343.)  The MRI revealed "a rather large disc herniation at L3-L4" on the left side, and "a fragment [of herniated material] with caudal migration."  (Id. at 343; see also id. at 341.)  There was also "a small central disc protrusion . . . with some indentation of the anterior aspect of the thecal sac" at L4-L5.  (Id. at 343.)  On April 19, 2001, Applegate received an epidural steroid injection to treat his back pain.  (Id. at 342.)

Applegate visited David G. Lindley, M.D., on January 15, 2005, and reported that the cold had caused his back pain to flare up.  (Id. at 350.)  Dr. Linsdley gave Applegate a prescription for Mobic, provided him with samples of Mobic "for the next couple of weeks," and provided him with samples of Tylenol.  (Id.)  He added, however, that he "would not be happy refilling medication without further investigation."  (Id.)

On or about August 29, 2007, Applegate visited Shiuvaun Jaeger, M.D., for a disability physical.  (Id. at 344.)  Applegate reported that he "reinjured his back in

4

2004" while working as a carpet cleaner.  (Id.)  He also reported that he had "numbness occasionally in his left lateral thigh"; that he was "unable to bend, lift, or sit for long periods of time"; that he "had x-rays done in North Platte in May of 2007 and October 2006"; that he "has not taken any medicines for his back"; and that he was "not doing any physical therapy."  (Id.)  Dr. Jaeger diagnosed low back pain, recommended that Applegate "be seen by a back specialist again," and suggested that Neurontin, Lyrica, or another epidural steroid block would be helpful.  (Id.)

Applegate visited Dr. Lindley on May 15, 2008, and complained of left elbow pain.  (Id. at 350.)  Dr. Lindley diagnosed tennis elbow, directed Applegate to use ice, and provided him with ibuprofen pills.  (Id.)  The pain persisted, and on July 14, 2008, Dr. Lindley gave Applegate a cortizone shot and 90 Percoset pills.  (Id.)

Applegate returned to Dr. Lindley on July 31, 2008, and reported that his back was "in horrible pain," and he had used all of his Percocet.  (Id.)  Dr. Lindley wrote, "He has been taking it [as] prescribed but I am just kind of concerned about him.  I had a long chat to [sic] him. . . . [A]s Percodan has worked better in the past, I have given him 90 Percodan but I have told him he will not be getting anymore [sic] narcotics.  I have told him that he would need an MRI and further investigation if it doesn't settle down.  He hasn't got the money but I am not going to keep on prescribing narcotics for him."  (Id.)

On May 31, 2009, Dr. Brad Bigelow, Licensed Psychologist, examined Applegate and prepared a psychological report.  (Id. at 353-356.)  Applegate told Dr. Bigelow that he has had a social anxiety disorder since he was a teenager.  (Id. at 353.)  He acknowledged "becoming depressed, frustrated, irritable and short with people due to his physical problems, inability to find a job and having to be dependent on his father for financial support."  (Id.)  He reported "having been in

resource classes[,] and [he believed that] he must have been retained a couple of times in the elementary grades due to being 20 during his senior year." (Id. at 354.)  He said that he has never lived independently, and he has never had a checking or savings account.  (Id.)  He also said that he cooks, cleans his room, watches sports and news on television, and listens to music.  (Id.)  Dr. Bigelow noted that Applegate was pleasant and conversant, that his mood and affect were normal, that his memory was intact, and that his attention and concentration were adequate.  (Id.)  Intelligence tests revealed "an overall level of intellectual functioning falling at the lower end of the average range (WAIS-III Full Scale IQ 85)."  (Id.)  Dr. Bigelow diagnosed "Social Phobia," "Mood Disorder Due to a General Medical Condition," "Osteoarthritis, Refer to Medical Records," and "Problems with primary support group, occupational and economic problems, problems with access to health care services, [and] restrictions in daily living."  (Id. at 355.)  He also assigned Applegate a GAF score of 65.  (Id.)[3]  Dr. Bigelow wrote, "Merle has never been involved in counseling and may be a possible candidate for Goodwill training or other programming . . . .  He reports having filled out a lot of job applications, but receiving no call backs due to his spotty employment history.  With tutoring, [he] might be able to complete the

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ."  DSM-IV at 32.  See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citing, inter alia, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)).

GED which would do a lot for his self-esteem.  Employers are reluctant to hire him because of his back condition and liability concerns."  (Id. at 356.)

On September 2, 2009, Applegate visited Dr. Lindley and was diagnosed with right tennis elbow.  (Id. at 312.)  Dr. Lindley administered a cortisone shot and noted that the same treatment worked on Applegate's left elbow in the past.  (Id.)

On November 3, 2009, Applegate reported to Dr. Lindley that he was "sore across his shoulder after doing heavy lifting" at the kitchen pantry where he worked. (Id.)  Applegate was "[t]ender over the right shoulder and posterior neck," and Dr. Lindley hoped that Applegate was suffering from "just a muscle strain rather than [a] discogenic problem."  (Id.)  Dr. Lindley provided Applegate with samples of medication.  (Id.)

Applegate visited Dr. Lindley again on March 23, 2010, and reported "recurrent pain in his back."  (Id. at 351.)  Dr. Lindley noted that when Applegate "goes out on jobs and things he gets tender in the paralumbar muscles," adding that there was "some reduction of straight leg raising with flexion of spine but no neurological deficit in his legs."  (Id.)  Dr. Lindley instructed Applegate to use "ibuprofen, heat and ice . . . and see if this helps" before using Percocet as necessary. (Id.)  Dr. Lindley wrote, "If he ever gets insurance and pains persist then we would look at an MRI scan and further investigations . . . ."  (Id.)

On April 14, 2010, Dr. Lindley examined Applegate and completed a medical report.  (Id. at 317-320.)  After noting that Applegate's chief complaint was back pain, Dr. Lindsey wrote the following history of Applegate's illness:

> This gentleman is known to have osteoarthritis and three herniated disks in his lumbar spine.  This happened in a shoveling accident while shoveling snow back in 2001.  He has had pain ever since with problems.  His pain is crossing the lower back [and] will shoot into

both of his legs, worse on the left than the right leg. He has some numbness also down his legs and in his hips with tingling in his feet. He states he can walk about two miles and he gets tired and his legs get sore. He can stand in one position for 30 minutes or sit for 30 to 40 minutes. If he lies down, he constantly has to adjust his legs due to pain in his back. He tries not to bend over and could only lift [a] maximum of 50 pounds and not on repetitive basis. He has had an epidural in his back in 2001. It has helped, but not insured significantly since then.

(Id. at 317.) Dr. Lindley examined Applegate and noted that he was tender in the paralumbar muscles, but he had "[r]easonable range of motion in all joints." (Id. at 320.) His peripheral nervous system was normal, "[t]one, power, muscle coordination, and sensation were intact," and reflexes were normal. (Id.) Dr. Lindley wrote, "X-rays taken of lumbosacral spine shows [sic] some scoliosis of the lumbar spine and some significant osteophyte formation . . . at L2, L3, L4, and L5 with sclerotic changes and reduction in disk space heights. Also loss of lumbar lordosis with muscle spasm." (Id.) He diagnosed "Back injury with discogenic back problems" and "Secondary osteoarthritis." (Id.)

On April 23, 2010, Jerry Reed, M.D., reviewed Applegate's medical records and completed a physical residual functional capacity assessment. (Id. at 324-332.) He listed Applegate's diagnoses as "Herniated Discs L-Spine," "OA L-spine," and "Small hernia." (Id. at 324.) He concluded that Applegate could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Id. at 325.)

On May 11, 2010, Applegate visited Dr. Lindley and reported "persistent pain in [his] lumbar spine." (Id. at 333.) Dr. Lindley noted tenderness in the "para lumbar muscles and occasionally shooting down her [sic] leg." (Id.) He wrote, "Percocet

doesn't seem to do anything to help.  He is kind of stuck in a corner as they can't afford investigation."  (Id.)  Despite the foregoing, Dr. Lindley provided Applegate with "another #120 Percocet."  (Id.)

On May 27, 2010, Glen Knosp, M.D., reviewed Applegate's medical records–including Dr. Lindley's May 11, 2010, record– and affirmed Dr. Reed's RFC assessment of April 23, 2010.  (Id. at 337.)

## B.   Applegate's Testimony

During the hearing before the ALJ on August 3, 2011, Applegate testified that he finished twelfth grade, but "didn't get the diploma." (Id. at 33.)  He also said that his reading and writing skills were probably at a seventh or eighth grade level.  (Id. at 43.)  At the time of the hearing, he lived in a house with his father.  (Id. at 34.)  He explained that his work history was poor because he "messed up on a lot of jobs," but he spent some time "doing odd jobs" and helping family members over the years.  (Id. at 34-35.)  He was doing volunteer work at a food pantry, which involved loading shopping carts with food, handing food to people, and doing some lifting.  (Id. at 35.)  He only worked three-hour days at the pantry, however.  (Id. at 36.)  Applegate said that he cooks for his father, goes shopping with him, does yard work, and does some cleaning.  (Id. at 36-37.)

Applegate testified that he cannot work full time because he "had a learning disability" and because his back and hips bother him.  (Id. at 37.)  He said that the pain shoots from his spine into his neck and causes him to suffer "about four headaches a month . . . if [he does not] catch it right away."  (Id.)  He said that he took Percocet in the past, but "they don't have funds for that anymore to see the doctor and [get] prescriptions."  (Id. at 38.  See also id. at 40 (indicating that Applegate had been taking Percocet, but his father stopped paying for the medication).)

Applegate said that on an average day, he could walk for about two blocks before his hips, legs, and back start to get numb.  (Id. at 41.)  He said that he could stand for about 40 minutes before he has to sit, and he could sit for about 30 minutes before he has to move around.  (Id.)  He added that he could lift approximately 20 pounds, but it bothers him to do so.  (Id. at 42.)

### C.    Other Testimony

Applegate's father, Ronald Applegate, testified at the hearing.  (See id. at 44-52.)  He said that Applegate sometimes takes care of the yard, but he does not do much work around the house.  (Id. at 47.)  He also said that in his opinion, Applegate was capable of holding a full-time job, but it "depends on what [it] would be."  (Id. See also id. at 49-50 (opining that Applegate could do light work involving bending and stooping and lifting "if he could have time to relax in between the job," adding that Applegate was probably capable of working for 50 minutes at a time).)  He said that he provided medical support when Applegate "has to have it," and he has purchased Percocet for him.  (Id. at 48.)

A Vocational Expert (VE) also testified at the hearing.  (See id. at 52-55.)  The ALJ asked the VE a series of "hypotheticals."  (Id. at 53.)  First, the ALJ asked the VE to assume that an individual of Applegate's age and education who had no past relevant work was "limited to performing light exertional level work"; could "occasionally climb stairs and ramps but never climb ropes, [ladders], and scaffolds, [and] can occasionally stoop"; "[s]hould avoid concentrated exposure to excessive vibration, unprotected heights[,] and hazardous machinery"; and was "limited to performing unskilled work only."  (Id. at 53.)  He then asked the VE whether there were "any jobs in the national or regional economy that an individual with all of those limitations can perform."  (Id.)  The VE responded affirmatively, adding that there

10

would "be a wide variety of unskilled, light exertional jobs that would fall within that category." (Id.)  The VE said that "[g]ood examples" of suitable jobs were "desert [sic] cup machine feeder," which is a job performed by 200 people in Nebraska and 23,000 people nationally; "burr grinder," which is performed by110 people in Nebraska and 12,500 people nationally; and "garment bagger," which is performed by 300 people in Nebraska and 57,000 people nationally.  (Id.)

The ALJ then asked the VE whether a person with the same age, education, and work experience who was "limited to performing sedentary exertional level work," could "occasionally climb stairs and ramps," could "never climb ropes, [ladders], and scaffolds," could "occasionally stoop, kneel, crouch, and crawl," "should avoid concentrated exposure to excessive vibration, unprotected heights and hazardous machinery," and was limited "to unskilled work only" could perform any jobs in the regional or national economy.  (Id. at 53-54.)  Again, the VE responded affirmatively and said that this person could perform jobs such as "eyeglass polisher," "printed circuit board assembler," and "major [sic]."  (Id. at 54.)

The ALJ then asked the VE whether she would change her testimony if the person described in the second hypothetical must also be allowed "to alternate between sitting and standing up to every 60 minutes."  (Id. at 54.)  The VE responded negatively.

Finally, the ALJ asked the VE whether the person described in the third hypothetical could perform any work "with the added limitation that any job must allow for occasional unscheduled disruptions of both the work day [and] work week," "[s]econdary to an unreliability as far as showing up for work secondary to symptoms or treatment, the necessity to lie down for extended periods of time during the day, and inability to maintain focus or concentration for a full eight hours, secondary to

11

pain distraction, those types of things." (Id. at 55.)  The VE responded that there were no jobs in the national or regional economies available for such a person. (See id.)

### D.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 416.920(a).  The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four, or five, or is found to be "disabled" at step three or step five.  See id.  In this case, the ALJ proceeded to step five and found Applegate to be not disabled.  (See Tr. at 15-21.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See id.  In the instant case, the ALJ found that Applegate "has not engaged in substantial gainful activity since February 10, 2010, the alleged onset date."  (Tr. at 15 (citation omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 416.920(a)(4)(ii), (c); id. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and

12

remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 416.920(a)(4)(ii), (c). The ALJ found that Applegate "has the following severe impairments: degenerative disc disease, arthritis, and learning disorder." (Tr. at 15 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 416.920(a). The ALJ found that Applegate "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 15 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[4] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find

---

[4] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

that the claimant is not disabled.  See 20 C.F.R. § 416.920(a)(4)(iv), (f).  The ALJ concluded that Applegate "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) in that he can lift 20 pounds occasionally and 10 pounds frequently, sit for 6 hours out of an 80-hour workday and stand and walk for 6 hours out of an 8-hour workday.  The claimant can never climb ropes, ladders or scaffolds, but can occasionally climb ramps and stairs.  The claimant can occasionally stoop.  The claimant must avoid concentrated exposure to excessive vibration, hazardous machinery and unprotected heights.  The claimant can perform unskilled work only." (Tr. at 16.)  The ALJ also found that Applegate "has no past relevant work." (Id. at 19 (citation omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See id.  The ALJ noted that Applegate was 45 years old on the date his application was filed, "which is defined as a younger individual." (Tr. at 19.)  He also found that Applegate "has at least a high school education and is able to communicate in English." (Id.)  The ALJ wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. at 20 (citations omitted).)  Specifically, Applegate "would be able to perform the requirements of representative occupations such as the following light unskilled jobs: dessert cup machine feeder . . . with 200 jobs in Nebraska and 23,000 jobs nationally; bur grinder . . . with 110 jobs in Nebraska and 12,500 jobs nationally; and garment bagger . . . with 300 jobs in Nebraska and 57,000

14

jobs nationally." (Id.)  Based on the foregoing, the ALJ concluded that Applegate "has not been under a disability, as defined in the Social Security Act, since February 10, 2010, the date the application was filed." (Id. (citation omitted).)

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error."  Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689,

692 (8th Cir. 2003).

## IV.   ANALYSIS

Applegate argues that the Commissioner's decision must be reversed because 1) "the failure to obtain medical treatment in the nature of surgery because of poverty" does not "justify denial of benefits"; 2) "the attribution of high school education to [a] claimant who didn't graduate constitute[s] prejudicial error in evaluating claimant's work capacity"; 3) "[a]ctivities of daily living does [sic] not equate to ability to perform full time employment"; 4) the ALJ's analysis of Applegate's credibility is flawed; and 5) a reasonable number of suitable jobs is not available to Applegate.  (See Pl.'s Br. at 4, ECF No. 15.  See also id. at 5-11.)  I shall analyze each of his arguments in turn.

## A.   The ALJ's Failure to Address Applegate's Poverty as an Explanation for His Minimal Treatment

First, Applegate argues that it was inappropriate for the ALJ to note that he "has not undergone any type of surgical procedure to repair his herniated disc" and that he has not "undergone any type of injections or used a TENS unit to treat his back pain." (Pl.'s Br. at 6, ECF No. 15.)  In support of his argument, Applegate cites Rice v. Chater, 86 F.3d 1 (1st Cir. 1996).  (See Pl.'s Br. at 6-7, ECF No. 15.)   In Rice, an ALJ decided to terminate a claimant's benefits on the ground that the claimant's impairment "had medically improved."   86 F.3d at 2.  The First Circuit Court of Appeals reversed, stating, "Under the circumstances present in this case, Rice's failure to seek treatment from 1973 to 1990 is not evidence of medical improvement.  As noted, changed symptoms, signs and laboratory findings are the only relevant indicia of medical improvement under the regulations," and there were

16

no such indicia in the record.  Id. (citations and emphasis omitted).  Thus, the ALJ erred by terminating the claimant's benefits based solely on his failure to seek treatment.  See id. at 2-3.

The instant case does not involve the termination of benefits due to medical improvement, and therefore Rice is inapposite.  Nevertheless, I find that Applegate has highlighted a significant shortcoming in the ALJ's decision.

The ALJ concluded that Applegate's claim that he suffers from debilitating back pain was not fully credible.  This conclusion was based in part on a finding that Applegate has sought only "a minimal amount of treatment for his back pain."  (Tr. at 17.)  In support of this finding, the ALJ noted that 1) Applegate "has only sought treatment twice since his application date and . . . has sought no treatment since May 2010"; 2) Applegate has undergone no surgery; 3) "there is no evidence that he has undergone any type of injections or used a TENS unit to treat his back pain"; 4) Applegate "did not report using any type of home modalities to treat his pain such as the use of heat or ice"; and 5) Applegate was not taking any type of pain medication, including "over the counter medications."  (Id. at 17-18.)  Although the record contains evidence suggesting that Applegate lacked the funds to pursue treatment, the ALJ's decision does not discuss this possibility.

The "lack of means to pay for medical services does not 'ipso facto preclude the [Commissioner] from considering the failure to seek medical attention in credibility determinations' regarding complaints of pain."  Hutsell v. Sullivan, 892 F.2d 747, 750 n.2 (8th Cir. 1989) (citation omitted).  However, Social Security Ruling 96-7p, 1996 WL 374186, at * 7 (July 2, 1996), clearly states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects without first considering any explanations that the individual may provide, or

17

other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." The ruling also lists several examples of explanations that "may provide insight into the individual's credibility," including the fact that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." Id. at *7-8. See also Blakeman v. Astrue, 509 F.3d 878, 888 (8th Cir. 2007).

I find that the ALJ erred by discounting Applegate's complaints of pain based upon the minimal amount of treatment that he received without first discussing the evidence and testimony showing that Applegate failed to pursue treatment due to a lack of funds. The ALJ's finding that "there is no evidence that [Applegate] has undergone any type of injections" is also erroneous, though it merits mention that Applegate received only a single injection several years prior to the date of his current application. (See Tr. at 342 (indicating that Applegate received an epidural steroid injection to treat his back pain on April 19, 2001).)

The Commissioner correctly notes that "there is no evidence in the record that Plaintiff sought low-cost treatment . . . or pursued treatment options available to indigents." (Def.'s Br. at 12, ECF No. 21.) The Commissioner also suggests that while Applegate's lack of funds might explain his inability to purchase "prescription pain medications such as Percocet, [it] would not explain his reluctance to use over-the-counter pain relievers." (Id.) These points, along with the fact that Applegate did not report using "home remedies" such as heat or ice, are relevant. Indeed, they tend to support an inference that Applegate's poverty does not fully explain the inconsistency between his allegations of pain and the minimal efforts he made to treat that pain. But I cannot determine whether the ALJ considered these facts, or the evidence of Applegate's poverty, before citing Applegate's minimal treatment as a

18

reason for discrediting him.  Because the ALJ's decision fails to address explicitly whether Applegate's poverty could explain his failure to seek more than minimal treatment, it was error for the ALJ to infer that Applegate's minimal treatment undermined his credibility.  E.g., Blakeman, 509 F.3d at 888.

It remains to be determined whether the ALJ's error requires a remand.  My analysis of that issue appears in Part IV.D. below, where I address Applegate's broader argument that the ALJ erred in analyzing Applegate's credibility.

**B.   The ALJ's Erroneous Finding that Applegate Graduated High School**

Applegate argues, "The ALJ's finding that the claimant has at least a high school education is contrary to the facts.  He did not graduate because he was not qualified to graduate.  Therefore he does not have a high school education and [cannot] be held to the educational status of a high school graduate." (Pl.'s Br. at 7, ECF No. 15.)

The ALJ clearly erred by finding that Applegate "has at least a high school education."  (Tr. at 19.)  The Commissioner argues that this error is harmless, however, because the ALJ also found that Applegate was limited to unskilled work that does not require a high school education.  (Def.'s Br. at 16-17, ECF No. 21.)

The regulations state that "[h]igh school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level and above," and "someone with these educational abilities" is generally considered capable of performing "semi-skilled through skilled work."  20 C.F.R. § 416.964(b)(3).  The same regulation states that the "reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs" are defined as "marginal education," which generally corresponds to "formal schooling at a 6th grade level or less."  Id. § 416.964(b)(2).  See also SSR 82-63, 1975-1982

Soc. Sec. Rep. Serv. 856, 1982 WL 31390, at *4 (1982) ("Marginal education . . . indicates that the person may not have attained a level of development in reasoning, arithmetic, and language which would suggest a vocational potential for more than unskilled work.  Generally, an individual is considered to have a marginal education if he or she has no more than a sixth grade elementary school education.  However, the level of formal education is not conclusive of a person's vocational competence. . . . [A] person may have attended school beyond the sixth grade, but other evidence may establish capability for reasoning, arithmetic, and language which does not, in fact, exceed the 'marginal' criterion.").  Conversely, the regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).

After careful consideration, I find that the ALJ's error is harmless.  First, and most significantly, the ALJ's erroneous finding that Applegate has "at least a high school education" appears in the written decision, (Tr. at 19), but it was not incorporated into the hypothetical questions presented to the VE during the hearing.  At the hearing, Applegate testified that he "finished 12th grade, but . . . didn't get the diploma."  (Tr. at 33.)  He also testified specifically that he did not graduate from high school, that his grades were poor, and that he believed his reading, writing, and math skills were at approximately a seventh- or eighth-grade level.  (Id. at 43-44.)  When questioning the VE, the ALJ did not ask the VE to assume that the claimants described in his "hypotheticals" had at least a high school education; rather, he asked the VE to assume that the hypothetical claimants had the "same educational level" as Applegate.  (Id. at 53-55.)  The uncontroverted testimony heard by the VE indicated that Applegate finished 12th grade, but he did not graduate and his grades were poor.  I have no reason to conclude that the VE's testimony was based on an erroneous

20

assumption that Applegate was a high school graduate, or that his education was "at least" at a high school level.

Also, the ALJ's hypothetical questions to the VE (and his RFC finding) limit Applegate to "unskilled work only." (Tr. at 16, 53.)  As noted above, unskilled work "needs little to no judgment" and involves "simple duties that can be learned in a short period of time."  20 C.F.R. § 416.968(a).  By including this limitation in his hypotheticals and RFC determination, the ALJ sufficiently presented Applegate's relevant mental limitations to the VE and incorporated them into his decision.  Cf. Potter v. Commissioner of Social Security, 223 F. App'x 458, 463 (6th Cir. 2007) (holding that ALJ's mistaken finding that claimant had a 12th grade education was not material because the rest of the ALJ's hypothetical adequately addressed the claimant's mental limitations).

Although I find that the ALJ's error does not require a remand given the particular facts and circumstances of this case, it should not pass without admonishment.  Greater care than was demonstrated here should be taken in drafting the Commissioner's decisions.  It would also be best for an adjudicator to include specific education levels in the hypotheticals presented to the VE, instead of merely stating that the hypothetical claimant's education level is the same as that of the actual claimant.

## C.    Activities of Daily Living

Applegate argues, "On page 4 of the ALJ's opinion he stated: 'In activities of daily living the claimant has no restriction.  The claimant can cook and clean.  He can care for his personal hygiene.'  Such a finding does not equate with the abilities required of an employee to perform full time work."  (Pl.'s Br. at 7-8, ECF No. 15.) Applegate then quotes passages from Baumgarten v. Chater, 75 F.3d 366, 369 (8th

Cir. 1996), wherein the court states that a claimant's ability to perform certain daily activities "provides little or no support for the finding that a claimant can perform full-time competitive work." (Pl.'s Br. at 8-9, ECF No. 15.)

The quote that Applegate attributes to the ALJ does appear on page 4 of the decision. (See Tr. at 16.) At this point, however, the ALJ was analyzing whether Applegate's mental impairment met the criteria of the "listings." (See id.) The ALJ did not make a finding that Applegate was capable of full-time work merely because he was able to cook, clean, and "care for his personal hygiene." (Id.)

Later, on page 6 of his decision, the ALJ wrote that Applegate's ability to cook, clean, and mow the yard "shows he can engage in physical activity, which does not support his allegation that he has debilitating pain." (Tr. at 18.) The ALJ also wrote that additional evidence of Applegate's "significant physical activity," such as "engaging in heavy lifting at a food pantry" and working as a caregiver for a relative, showed an "ability to engage in . . . physically demanding activities" that "significantly detracts from [Applegate's] allegation that he has debilitating back pain." (Id.) The ALJ did not err by considering whether Applegate had engaged in activities that were inconsistent with his allegations of severe back pain. See, e.g., Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) ("We have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010))). Also, the ALJ did not conclude (as Applegate seems to imply) that these activities demonstrate an ability to engage in full-time competitive employment.

The ALJ also wrote on page 6 of his decision that Applegate's "numerous daily chores," his work as a carpet cleaner and caregiver, and his volunteer work suggest that his learning disability would not prevent him from completing unskilled work.

(Tr. at 18-19.)  Applegate does not take issue with this finding, and I conclude that it merits deference.

In short, the ALJ did not find that Applegate's activities demonstrated that he was capable of full time work; rather, the ALJ properly considered Applegate's activities at step three of the sequential analysis and when determining Applegate's RFC.

### D.    The ALJ's Credibility Analysis

Applegate argues that "the ALJ failed to detail the reasons for discrediting [the] claimant's testimony."  (Pl.'s Br. at 9, ECF No. 15.)  I disagree.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Id. (citation omitted) (alteration in original).  The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for

23

doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

The ALJ wrote that although Applegate's "medically determinable impairments could resonably be expected to cause some of the alleged symptoms" described in Applegate's testimony, his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Tr. at 17.)  He then listed several specific reasons for discounting Applegate's testimony, including 1) the minimal amount of treatment that Applegate has sought, 2) the lack of objective medical findings to support Applegate's claims,[5] 3) the fact that Applegate was not taking any type of over-the-counter medication to treat his pain, 4) the fact that Applegate engaged in "significant physical activity," 5) Ronald Applegate's testimony about Applegate's abilities, 6) the fact that the instant application was "at least the claimant's sixth application for supplemental security income benefits since 2004," 7) Applegate's poor work history, and 8) the fact that Applegate "was currently looking for employment." (Id. at 17-19.)

As I explained in Part IV.A., it was improper for the ALJ to discredit Applegate's testimony based on the minimal amount of treatment that he has received without first addressing whether his poverty reasonably explained his failure to seek treatment.  That aside, I find that the ALJ has provided several good reasons for

---

[5]  The ALJ noted that the record included objective findings that Applegate had a reasonable range of motion; normal tone, power, and muscle coordination; normal sensation and reflexes; no significant deficits in strength, neurological function, posture, sensation, pulses, gait; and no significant limits on his abilities to squat, stand, walk, sit, lift, carry, bend, or stoop.  (Tr. at 17-18.)

discrediting Applegate's testimony, and the ALJ's credibility determination merits deference.[6]

Applegate argues in passing that "[t]he testimony of the VE in this record does not legally qualify as substantial evidence." (Pl.'s Br. at 10, ECF No. 15.)  His argument appears to be based on the notion that the ALJ's hypothetical questions to the VE did not encompass all of Applegate's impairments.  (See id.)

> A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.  The hypothetical question must capture the concrete consequences of the claimant's deficiencies.  However, the ALJ may exclude any alleged impairments that he has properly rejected as untrue or unsubstantiated.

Perkins v. Astrue, 648 F.3d 892, 901-02 (8th Cir. 2012) (citations, quotation marks, and alteration brackets omitted).  I find that the ALJ's first hypothetical question to the VE was sufficient, and the VE's testimony constitutes substantial evidence to support the ALJ's decision to deny benefits.

## E.    Whether a "Significant Number" of Suitable Jobs Is Available

As noted previously, the VE responded to the ALJ's first hypothetical question by testifying that the claimant could perform "a wide variety of unskilled, light exertional jobs," including examples such as "dessert cup machine feeder," "burr

---

[6] I note in passing that Applegate claims, without citing any supporting authority, that "[p]rior denials should be disregarded by a subsequent ALJ." (Pl.'s Br. at 11, ECF No. 15.)  I take it that Applegate means to argue that the ALJ should not have concluded that the frequency of Applegate's applications "negates the overall credibility of the claimant's various physical and mental allegations." (Tr. at 19.)  Assuming, for the sake of argument only, that it was error for the ALJ to draw this conclusion, I find that the remaining factors cited by the ALJ provide ample support for his decision to discredit Applegate's testimony.

grinder," and "garment bagger." (Tr. at 53.) She said that in Nebraska, there were 200 "dessert cup machine feeder" jobs, 110 "burr grinder" jobs, and 300 "garment bagger" jobs. (Id.) Applegate argues,

> The above limited number of jobs available in Nebraska is not a reasonable number of jobs in a state with a civilian labor force of 1,005,455 and employment of 960,830. 300 jobs out of a total of 960,830 computes to a percentage factor of .00031. Under any analysis 300 jobs is not a reasonable number of jobs out of a total of 960,830.

(Pl.'s Br. at 10, ECF No. 15.)

Because the ALJ concluded that Applegate could not return to any past relevant work, "the Commissioner bears the burden of showing that [Applegate] could perform jobs that exist in significant numbers." Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997) (citation omitted). See also 42 U.S.C. § 423(d)(2)(A) (defining "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country"). "[T]he application of the significant numbers requirement to a particular claimant's factual situation" is a matter left "to the trial judge's common sense." Hall, 109 F.3d at 1295. "Factors the trial judge should consider include the level of the claimant's disability, the reliability of both the claimant's and the VE's testimony, and the types and availability of work that the claimant could perform." Id.

After carefully considering the record, including Applegate's lack of a high school diploma, relative lack of work experience, age, and work-related limitations, I find that the "significant numbers" requirement has been satisfied in this case. The VE testified that the hypothetical claimant with Applegate's RFC could perform a wide variety of jobs, and she cited three examples of suitable jobs that, in total, are filled by 610 people in Nebraska. Additional information about the "wide variety"

of suitable jobs would have been helpful; nevertheless, it is clear that in the VE's view, Applegate would be capable of filling far more than 610 jobs that currently exist in Nebraska.[7]  Under the particular circumstances of this case, this represents a significant number.  Cf. Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (holding that a claimant with unique skills, 25 years of experience as a security guard, and good qualifications to perform the sedentary security jobs described by the VE was able to do a significant number of jobs in the region, even if a total of only 500 suitable jobs were available in the region).

In summary, although the ALJ's decision is not free of error, the Commissioner's decision to deny Applegate's application is supported by substantial evidence in the record as a whole.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated March 25, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

---

[7] I note in passing that the VE identified an additional 500 jobs that a person with a similar RFC, but who was limited to sedentary work that allowed alternation "between sitting and standing up to every 60 minutes," could perform. (Tr. at 54.)  It is likely that Applegate could perform these jobs given his age, experience, and RFC.

27